T.C. Memo. 2018-26

UNITED STATES TAX COURT

FARROKH E. POURMIRZAIE AND MINOO S. POURMIRZAIE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25558-14.                    Filed March 8, 2018.

<u>Held</u>: Ps' rental real estate activities were passive activities within the meaning of I.R.C. sec. 469, and, therefore, Ps' loss deductions from those activities were limited by I.R.C. sec. 469(i). Ps did not establish that P-W was a real estate professional because we find that she spent only 416 hours during each audit year in real property trade or business activities.

<u>Held</u>, <u>further</u>, I.R.C. sec. 6662(a) accuracy-related penalties sustained.

<u>Framta Saechao</u> and <u>Robert L. Goldstein</u>, for petitioners.

<u>Daniel J. Bryant</u>, for respondent.

[*2]      MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined deficiencies in, and accuracy-related penalties with respect to, petitioners' Federal income tax for their taxable years 2010, 2011, and 2012 (audit years):

| Audit year | Deficiency | Penalty sec. 6662(a) |
|------------|------------|----------------------|
| 2010 | $14,299 | $2,860 |
| 2011 | 13,139 | 2,628 |
| 2012 | 15,313 | 3,063 |

Unless otherwise stated, all section references are to the Internal Revenue Code in effect during the audit years and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

At the trial of this case, petitioners conceded all issues other than (1) respondent's adjustments disallowing a portion of their rental real estate losses for each of the audit years and (2) the penalties.  Respondent made the adjustments on the grounds that petitioners' rental real estate activities during the audit years were passive activities within the meaning of section 469 and, therefore, their loss deductions from those activities were limited by section 469(i).  The parties agree

**[*3]** that the issue that we must decide is whether petitioner wife (Mrs. Pourmirzaie) was a real estate professional during the audit years. The parties use the term "real estate professional" to describe an individual (1) more than half of whose time spent performing personal services in one or more businesses during a taxable year is spent performing such services in a real property business and (2) who, during that taxable year, performs more than 750 hours of services in real property trades or businesses in which she materially participates. See sec. 469(c)(7).

Petitioners bear the burden of proof. See Rule 142(a). Because petitioners have failed to prove that during any of the audit years Mrs. Pourmirzaie performed more than 750 hours of services in a real property business, she was not during any of the audit years a real estate professional, and we will sustain respondent's adjustments with respect to petitioners' rental real estate losses. We will also sustain the section 6662(a) penalties.

FINDINGS OF FACT

Petitioners resided in California when they filed the petition. The parties have stipulated certain facts and the authenticity of certain documents. The facts stipulated are so found, and documents stipulated are accepted as authentic.

**[*4]** Petitioners' Returns

For each of the audit years, petitioners made a joint return of income on Form 1040, U.S. Individual Income Tax Return (collectively, audit-year returns). On their 2010 and 2011 Forms 1040, petitioners showed no tax due. For 2010, however, respondent rebated to them $544 on account of a section 36A making-work-pay credit. On their 2012 return, they showed a tax due of $1,143, and there was no rebate. On each of the audit-year returns, petitioners reported a substantial loss from rental real estate properties: $125,501, $112,449, and $73,297[1] for 2010, 2011, and 2012, respectively. For all three years, those properties included:

1. a four-unit residential property in San Jose, California (San Jose property);

2. a single-family condominium in San Diego, California, in which petitioners owned a partial interest (San Diego property);

3. a single-family residence in Tucson, Arizona (Tucson property);

4. a single-family condominium in Bremerton, Washington (Bremerton property); and

---

[1]Unaccountably, respondent's notice of deficiency shows a rental real estate loss reported by petitioners for 2012 of only $72,297. We will sustain an adjustment based on that amount.

[*5] 5. a single-family residence in Discovery Bay, California (Discovery Bay property).

Petitioners' reported rental real estate loss for 2010 included a loss from one additional property, a "Marriott timeshare", not otherwise identified by petitioners (Marriott timeshare).

For all of the audit years, petitioners elected pursuant to section 469(c)(7)(A) to treat all interests in rental real estate as a single activity.

San Jose Property

During the audit years, petitioners shared responsibility for management of the San Jose property. They did not keep an office at the property nor store tools there. Neither did they keep contemporaneous records of the time they spent at the property. Mrs. Pourmirzaie testified that they spent 15 to 20 hours a week there. She could not, however, for any particular visit, recollect when they arrived or when they departed. The length of any visit, she added, "depend[][ed] on the work that * * * was there." She testified that they were always there on Saturdays and Sundays, and, on average, they would be there from 10 a.m. to 5 or 6 p.m. on Saturdays and from 12 noon to 5 or 6 p.m. on Sundays. On their visits, she continued, they took care of necessary maintenance tasks, collected rent, if necessary, and generally ensured that the property was in good order. She testified

**[*6]** that both she and Mr. Pourmirzaie worked at the property during those visits. In fact, she added, "he's a workaholic. He loves to work on that property, even though he has a full-time job." She testified that, during the week, she visited the property to conduct surveillance because of the poor neighborhood.

San Diego Property

During the audit years, petitioners also shared responsibility for management of the San Diego property. Mrs. Pourmirzaie could not remember specifically what types of management activities she performed beyond visiting the property to prepare it for, and to meet, any new tenant. She could not recall how many times in 2010 she visited the San Diego property although, when she did visit the property, she testified: "We like San Diego so when we go there, we stay longer, you know. I love San Diego."

Tucson Property

Petitioners did not directly manage the Tucson property. Instead, they hired a property manager, with whom Mrs. Pourmirzaie testified that she communicated "[m]aybe one or two hours * * * [i]n a year, a month. * * * I don't remember. I don't recall."

**[*7]** <u>Bremerton Property</u>

During the audit years, petitioners dealt with the tenants at the Bremerton property by telephone although Mrs. Pourmirzaie could not recall how long in 2010 she spent on the telephone with a tenant: "Not very long."

<u>Discovery Bay Property</u>

During the audit years, she and her husband managed the Discovery Bay property. There was one tenant during those years, and she dealt with him principally by telephone. She testified that she visited the property during 2010 but could not recall how often or how many hours she spent there.

<u>Marriott Timeshare</u>

Petitioners offered no evidence with respect to the Marriott timeshare.

<u>Calendars</u>

The parties have stipulated two calendars, one for 2010 (2010 calendar) and one for 2011 (2011 calendar). The two calendars purport to show time petitioners spent at their rental properties during those two years. Petitioners prepared the two calendars from memory during the course of respondent's examination of their audit-year returns. The 2010 calendar has entries for every Saturday and Sunday in 2010 other than Sunday, October 31 (Halloween), and Saturday, December 25 (Christmas Day). The usual, uniform entry for both Saturday and Sunday is,

[*8] without identifying a location (but we assume the San Jose property), "Weekly Cleaning and Repairing", from 10 a.m. to 6 p.m. on Saturday and from 10 a.m. to 4 p.m. on Sunday. There are occasional entries for time spent in San Diego. There are twice a month entries for midweek "Security Surveillance", uniformly from 8 to 10 p.m., and there are assorted other entries on various dates, such as "Home Depot", "Paperwork and Bill Paying", and "Post Office", some lacking time entries and some, like "Paperwork and Bill Paying", showing twice monthly time entries, usually from 7 to 8 p.m. The 2010 calendar does not specify who, as between Mr. or Mrs. Pourmirzaie, performed the listed tasks.

The 2011 calendar is similar although it does show monthly totals of hours for each petitioner, totaling, for the whole year, 1,133 hours and 905 hours for Mr. and Mrs. Pourmirzaie, respectively. The 2011 calendar shows 2 hours of surveillance from 8 to 10 p.m. on April 27 and 3 hours on paperwork and bill paying from 7 to 10 p.m. on April 29. Monthly statements for petitioners' checking account at Wells Fargo Bank for the months of April and May 2011 show check card purchases for food and lodging on April 28 and 29 in London, England, and at Heathrow airport. There are no domestic purchases shown for either of those dates. The 2011 calendar shows both petitioners working at an unspecified property from 10 a.m. until 4 p.m. on August 7. The Wells Fargo

**[*9]** Bank statement for August 2011 shows food purchases in Dallas, Texas, on that date. The 2011 calendar shows one or both petitioners working at unspecified properties for 40 hours on September 9 through 13. The Wells Fargo Bank statement for September 2011 shows food and other purchases and a cash withdrawal in Philadelphia, Pennsylvania, on those dates. The 2011 calendar shows Mrs. Pourmirzaie working at an unspecified property on October 22 and 23. The Wells Fargo Bank statement for October shows food and other purchases in New York, New York, Boca Raton, Florida, and Philadelphia, Pennsylvania, on those dates.

There is no calendar for 2012.

Penalty Approval

Internal Revenue Agent Tuan Nguyen examined petitioners' audit-year returns and, among other things, proposed the accuracy-related penalties here in issue. Mr. Nguyen's supervisor was Supervisory Internal Revenue Agent Michael J. Adams, who approved in writing Mr. Nguyen's determination of those penalties on the basis of petitioners' underpayment due to a substantial understatement of income tax for each of the audit years.

**[*10]**                                        OPINION

## I.      Introduction

We must decide whether for any of the audit years Mrs. Pourmirzaie was a real estate professional. Since we decide that she was not, we must decide whether petitioners are liable for the section 6662(a) accuracy-related penalties determined by respondent. We decide that they are.

## II.      Section 469

Section 469 generally disallows a deduction for any passive activity loss for an individual. A passive activity loss is the amount by which aggregate losses from all passive activities during the taxable year exceed the aggregate income from all passive activities during the year. Sec. 469(d)(1).

A passive activity is a trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). Rental activities are per se passive, even if a taxpayer materially participates in such activities. Sec. 469(c)(2). An activity is a rental activity if gross income attributable to the activity is paid principally for the use of tangible property. See sec. 1.469-1T(e)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).

An exception to the per se passive rule exists for taxpayers who are real estate professionals. Sec. 469(c)(7). A taxpayer is a real estate professional if

**[*11]** (1) more than one-half of the personal services performed in trades or businesses by the taxpayer during the taxable year are performed in real property trades or businesses in which the taxpayer materially participates and (2) the taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.  Sec. 469(c)(7)(B).  Where taxpayers file a joint return, either spouse must satisfy the above requirements separately.  Id.

Participation in an activity may be established by any reasonable means. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  Reasonable means include identification of services performed and the approximate number of hours spent performing such services based on appointment books, calendars, or narrative summaries.  Id.  Contemporaneous logs or similar documents are not required to the extent participation may be established by other reasonable means.  Id.  And while the regulations permit some flexibility with respect to the evidence required to prove participation, we are not required to accept postevent "ballpark guesstimates", nor are we bound to accept the unverified, undocumented testimony of taxpayers.  See, e.g., Lum v. Commissioner, T.C. Memo. 2012-103, 2012 WL 1193182, at *4.

[*12] Petitioners propose that, on the basis of daily entries on the 2010 and 2011 calendars, we find that Mrs. Pourmirzaie spent 790 hours and 949 hours during those years, respectively, at the San Jose property doing, generally, routine cleaning, repairs, gardening, bill paying, and surveillance. They propose that, on the basis of her testimony, we find that she spent 15 to 20 hours a week at the San Jose property carrying out those tasks. They propose that, on the basis of entries in the 2010 and 2011 calendars, we find that Mrs. Pourmirzaie spent 275 hours and 178 hours during those years, respectively, at the San Diego property doing, generally, "remodeling, repairing, and interviewing tenants to rent out the property." On the basis of Mrs. Pourmirzaie's testimony, petitioners propose that we find that she "spent one or two hours per month or year" managing the Tucson property. Petitioners propose no finding with respect to the number of hours that Mrs. Pourmirzaie spent during any of the audit years managing either the Bremerton or the Discovery Bay property. They propose that we find that, in 2010, Mrs. Pourmirzaie spent approximately 1,064 hours on her rental activities and that, in 2011, she spent approximately 1,127 hours on her rental activities.[2]

_____

[2]On brief, petitioners reverse those hourly estimates, proposing that we find that she spent 1,127 hours and 1,064 hours on her rental activities during 2010 and 2011, respectively. The 2010 calendar does not, for numerous dates, specify who,

(continued...)

[*13] We will make none of the proposed findings of fact that petitioners ask us to make. We have little confidence that the 2010 and 2011 calendars accurately reflect the dates and the times that petitioners, and, in particular, Mrs. Pourmirzaie, spent at either the San Jose or the San Diego property. The calendars were prepared from memory, after the audit years, during the course of respondent's examination of the audit-year returns, without benefit of any contemporaneous time records. The calendars show an exactitude as to the dates and the times petitioners were at the San Jose and San Diego properties not matched by Mrs. Pourmirzaie's memory at trial, where she testified that, for any 2010 visit to the San Jose property, she could not recollect the time they went or returned and the length of their visit depended on the amount of work to be done. With respect to the San Diego property, she testified that she could not recall how many times she visited the property in 2010 or the types of management activities that she performed. On her visits to San Diego, she added, she stayed longer than was necessary because "I love San Diego."

Further, the record contains Wells Fargo bank statements that seemingly contradict petitioners' calendar entries that show one or the other, or both, working

---

²(...continued)
Mr. or Mrs. Pourmirzaie, performed the described tasks. We accept the switched hours as a mistake and have corrected the totals.

**[\*14]** at a property on April 27, August 7, September 9 through 13, and October 22 and 23, 2011, and doing paperwork and paying bills (which, we assume, they did at home) on April 29, 2011.  When Mrs. Pourmirzaie was asked by respondent's counsel to explain the seeming discrepancy for August 7, 2011, she answered:

> As I mentioned, we just go through our memory, we don't remember exactly, but we do put hours in \* \* \* [the San Jose property].  I mean, it's not like we're working for a company, we [don't] clock in, we [don't] clock out.  But we do spend a lot of time in that property.

> And I think that time is when we had a--probably wedding.  I don't remember.

Nor, independent of the two calendars, can we accept Mrs. Pourmirzaie's testimony of time she worked at the San Diego and San Jose properties.  Mrs. Pourmirzaie testified that she and her husband shared responsibility for management of both properties.  She was clear that, on weekends, they both visited the San Jose property for a total of 14 hours each.  Her husband, she testified, was a workaholic.  Nevertheless, she proposes that we find that she, herself, spent 15 to 20 hours a week at the San Jose property carrying out management tasks.  If we add to her suggested totals the 14 hours a week that her husband was at the San Jose property performing management tasks, then we have

[*15] the couple spending 29 to 34 hours a week managing a four-unit residential apartment building at which they neither kept an office nor stored any tools. Simply stated, we do not believe it.

Nevertheless, petitioners have convinced us that they owned the rental real estate properties in question and that, during the audit years, Mrs. Pourmirzaie spent considerable time managing the properties, including regular visits to the San Jose property. Petitioners' evidence does not support their proposed findings of fact that in 2010, Mrs. Pourmirzaie spent approximately 1,064 hours on her rental real estate activities and that, in 2011, she spent approximately 1,127 hours on her rental real estate activities. Taking into account the substantial (and, on many days, equal) time spent by Mr. Pourmirzaie, on management activities, we find that Mrs. Pourmirzaie spent an average of one day a week, 8 hours, in real estate trade or businesses activities; i.e., 416 hours during each of the audit years. Because she does not meet the 750-hour requirement of section 469(c)(7)(B)(ii), she was not a real estate professional for purposes of section 469(c)(7) during the audit years. Therefore, we need not address whether Mrs. Pourmirzaie spent more than 50% of her time in real estate trades or businesses under section 469(c)(7)(B)(i).

[*16] III.     Accuracy-Related Penalty

Section 6662(a) and (b)(2) provides for an accuracy-related penalty of 20% of the portion of an underpayment of tax attributable to "[a]ny substantial understatement of income tax."  Section 6662(d)(2)(A) defines the term "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed, reduced by any rebate.  In the case of an individual, an understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial" authority.  Sec. 6662(d)(2)(B)(i).  Section 6664(c)(1) provides an exception to the imposition of the section 6662(a) accuracy-related penalty if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith.

The Commissioner bears the burden of production with respect to penalties. See sec. 7491(c).  To carry that burden, he must produce evidence regarding the appropriateness of imposing the penalty.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  In some circumstances, that includes evidence that the initial determination of the penalty received written supervisory approval.  See sec. 6751(b)(1); Graev v. Commissioner, 149 T.C. __ (Dec. 20, 2017), supplementing

**[\*17]** 147 T.C. __ (Nov. 30, 2016). The taxpayer's concessions may be taken into account in determining whether the Commissioner has met his burden. Oria v. Commissioner, T.C. Memo. 2007-226, 2007 WL 2318367, at \*4. Once the Commissioner carries his burden of production, the taxpayer bears the burden of proving that she is entitled to relief because of substantial authority or under section 6664(c)(1). See Higbee v. Commissioner, 116 T.C. at 446.

The deficiency that respondent determined for each audit year exceeds $5,000, which is the greater of 10% of the total corrected tax liability shown on the notice of deficiency for each audit year or $5,000. Thus, for each of the audit years there was a substantial understatement of income tax. His revenue agent's initial determination of the penalties received written approval by the revenue agent's supervisor. Respondent has, therefore, met his burden of production. Petitioners have shown no substantial authority for any portion of their understatements of income tax, nor have they proposed that we find any facts that, if found, would establish that they had reasonable cause and acted in good faith with respect to any portion of the tax they underpaid. In defense to the section 6662(a) penalty, they rely only on their proving, which they have not, that there is no deficiency. We will sustain the section 6662(a) penalties on the grounds that,

[*18] for each of the audit years, petitioners' underpayment was due to a substantial understatement of income tax.

<u>Decision will be entered for</u>

<u>respondent</u>.